IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Jaycee Wamer<br>3230 Beachwood Drive<br>Oregon, Ohio 43616<br><br>    Plaintiff,<br> vs.<br><br>The University of Toledo<br> c/o The State of Ohio<br>150 E. Gay St., 21st Floor<br>Columbus, Ohio 43215<br><br>    Defendant. | Case No. _____<br><br>Judge _____<br><br>**Complaint with Jury Demand** |

## I. Introduction

1. Plaintiff Jaycee Wamer hereby asserts a claim against the University of Toledo ("UT") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1981, *et seq.* ("Title IX"), arising from the University's deliberate indifference to reports that Erik Tyger, a professor in UT's communications department, sexually harassed her.

2. On May 2, 2018, while Wamer attempted to finish and turn in a project for a course taught by Tyger, Tyger repeatedly made unwelcome sexual advances toward her, including sexual comments and inappropriate touching.

3. Tyger's sexual harassment of Wamer continued after she left his office, as he sent her text messages seeking details about her work schedule because, as Wamer feared, he wanted to approach her while she was at work.

4. Soon after, Wamer contacted UT professor Kevin O'Korn to discuss Tyger's sexual misconduct. Based on Tyger's actions, O'Korn and Wamer each made a report to UT's Title IX office.

5. In violation of UT's Title IX obligations, UT essentially ignored the detailed, specific, and credible reports concerning Tyger's sexual misconduct that UT had received from O'Korn and Wamer.

6. Further, despite UT's own policies, in which it promises students like Wamer that it will take prompt action in response to reported sexual harassment, including by performing a fair and impartial investigation and providing remedies to affected students, UT did not take any action in response to the first two reports until six months later, when it received yet a third report of Tyger's sexual misconduct.

7. Because of UT's deliberate indifference to the first two reports that Tyger sexually harassed Wamer, she avoided coming to campus, endeavored to change her major, and enrolled almost exclusively in online courses, fearing that she would come into contact with Tyger, who remained employed as a professor in UT's communications department.

## II. Parties

8. Wamer is a student at UT who, at all relevant times, was a U.S. citizen and a resident of Lucas County, Ohio.

9. Defendant UT is and at all relevant times was a public university, with its principal place of business in Lucas County, Ohio.

10. At all relevant times, UT, as a public university and institution of higher education, received funding from the federal government and was therefore required to comply with Title IX.

## III. Jurisdiction and Venue

11. Under 28 U.S.C. § 1331, this Court has federal-question jurisdiction over this litigation because it arises under 20 U.S.C. § 1681(a). *See Bose v. Bea*, 947 F.3d 983, 988 (6th Cir.2020), citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed. 2d 560 (1979) ("Though the statute contains no express private right of action, the Supreme Court has held that individuals may

sue funding recipients for violating Title IX.").

12. This Court has jurisdiction over UT because it is a public university that operates in Ohio.

13. Under 28 U.S.C. § 1391(b)(1) and (2), venue is proper in this Court because UT is a resident of, and the events and omissions giving rise to this litigation occurred in, Lucas County, Ohio.

## IV. Facts

**A. UT professor Erik Tyger sexually harassed Ms. Wamer while she was attempting to complete and turn in a final project for his class.**

14. In Fall 2017, UT hired Erick Tyger as a lecturer for UT's communications department. In this role, Tyger worked closely with students, assisting them with editing, developing, and producing digital content, including for UT:10 News, UT's student-produced newscast.

15. Because Tyger was hired to teach and advise students in their communications studies and assist with UT:10 News, UT knew that a professor in Tyger's position would come into close contact with and frequently spend time alone with students after regular business hours.

16. In classes in which Wamer was Tyger's student, Tyger frequently made inappropriate comments to the class, including that students should ask about Tyger's drug overdose, that Tyger would not have gotten married at such a young age if his wife had not been pregnant, and that, concerning the "#metoo" movement against sexual assault and harassment, Tyger believed that the women were "asking for it."

17. On May 2, 2018, Wamer visited UT's Media Services building, where Tyger had an office, to complete and submit a final project for a course in which Tyger was her professor.

18. While Wamer worked on finishing her final project, Tyger approached Wamer from behind, placed his arm on her, rested it on her chest, and proceeded to touch her hair.

19. Despite the trauma caused by Tyger's unwelcome advances, Wamer continued working on her project because she needed to submit it and leave to attend an off-campus exam in another course.

20. Wamer asked Tyger for permission to use the computer in his office because Wamer needed a printer to finish and submit her final project. When Tyger indicated that Wamer could use his computer for that purpose, Wamer entered Tyger's office.

21. When Wamer entered Tyger's office, Tyger began to ask Wamer about her job at Maumee Bay State Park, telling her that he had once worked there and "would go into the empty rooms to f*** women."

22. Tyger, who was seated at the computer, refused to move from his seat so that Wamer could use the computer to print off documents, forcing her to reach across Tyger's lap.

23. While Wamer used Tyger's printer, Tyger leaned his head against Wamer, told her that she "smelled good," and asked for the name of the perfume that she was wearing because Tyger "wanted to buy it for [his] wife." Tyger also placed his hand on the middle of Wamer's thigh.

24. Throughout this interaction, Wamer feared that Tyger would escalate his behavior toward her because she and Tyger were alone in the office.

25. After Wamer finished using the printer and left Tyger's office, Tyger texted Wamer that she "better come visit me again!" *See* **Exhibit 1**, Title IX Investigation Report, at 21. Wamer did not respond to Tyger's text message.

26. The next day, Tyger texted Wamer for information about when she would be at work, seeking details about the "days and times [she would] be" there and whether she had "a set schedule" or it was "just whenever." *See* **Ex. 1**, at 21.

27. Fearing that Tyger would show up unannounced at her workplace during a time when she was working and would be unable to leave, Wamer ignored Tyger's requests for information about her work schedule. Later that night, Tyger texted her "Or don't answer me. It's cool." *Id.* at 21.

**B.**     **UT's Title IX policies assured Wamer not only that her participation was not required in order for action to be taken against Tyger, but also that UT would afford her remedies for having experienced sexual misconduct at the hands of a UT professor.**

28. In its Title IX policies UT assures its students that "[w]ithin 7 days of receiving a report of alleged sexual misconduct," UT will begin pursuing an investigation if one is "necessary." *See* **Exhibit 2,** 3364-50-01 Title IX Policy, at 13 (H)(2).

29. UT's Title IX policies also promised students that UT "will take appropriate action to address alleged sexual misconduct, *including instances where a party does not respond to communication from the University.*" *Id.* at 14 (H)(3)(a) (emphasis added).

30. Through such policies, UT ensured students like Wamer that unwelcome sexual harassment, particularly from a professor, would be handled in a "prompt, reliable, [and] impartial" manner," (*id.* at 16 (H)(8)), as well as that UT would "provide[] remedies to individuals who experience sexual misconduct … include[ing] educational programming, changes to policies and procedures, counseling, and opportunities to change educational, work, or living situations." *Id.* at 16(I).

**C.  Despite having received multiple reports that Tyger had sexually harassed Wamer, UT took no action in response, failing to so much as investigate the credible allegations that Tyger had committed sexual misconduct against an enrolled student.**

31. On May 4, 2018, the day after Tyger had made unwelcome sexual advances toward her, Wamer contacted Kevin O'Korn, another member of the communications department faculty. **Ex. 1**, at 26.

32. Based on the information that O'Korn received from Wamer, O'Korn submitted a Sex Discrimination/Harassment report to UT's office of Title IX and Compliance. *Id.*

33. O'Korn's report alleged that Tyger had "repeatedly touched [Wamer's] leg[,] said 'nasty stuff' to her," and told Wamer that since her "final grade was in … [Tyger could] hit on [her]." *Id.*

34. O'Korn further requested that UT investigate Wamer's allegations against Tyger because, as a communications student, Wamer "would have contact with Mr. Tyger throughout [her] time at … [UT] if [she] continues with th[e] major." *See id.*

35. Donald Kamm, UT's Director of Title IX and Compliance, accessed and modified O'Korn's

report on May 4, 2018, at 3:23 P.M. *Id.* at 27.

36. Wamer also submitted a report to UT's office of Title IX and Compliance about Tyger's misconduct. *Id.* at 28.

37. Like O'Korn's report, Wamer's report was forwarded to Kamm. Other members of UT's Title IX office, including Kevin West and Katrina Notke, also received copies of Wamer's report. *Id.* at 28.

38. UT's Title IX Office asked Wamer whether she was "comfortable" attending a face-to-face interview on campus about the reports that Tyger had sexually harassed her.

39. Wamer was not comfortable attending a face-to-face interview with the Title IX investigators. Among other concerns, Wamer feared that she would come into contact with Tyger, and also feared retribution, because Wamer believed that "the faculty member usually wins out in these situations." *See* **Ex. 1**, at 45.

40. At no time did UT indicate to Wamer that UT would cease its investigation into Tyger and close the case without taking any corrective action if Wamer did not attend an interview.

41. To the contrary, UT informed Wamer that—as required by the Title IX policies described herein—UT would continue pursuing the case against Tyger even if Wamer did not come in for an in-person interview.

42. Had UT informed Wamer that it would cease its investigation, Wamer would have agreed to attend an interview and otherwise participate fully in the investigatory process.

43. At no time did Wamer indicate to UT that she was choosing not to pursue the complaints against Tyger or that she wished for UT not to continue its investigation into Tyger.

44. Three weeks after O'Korn's report to UT of Tyger's conduct, Wamer received notification from UT's Title IX Office that UT had closed its investigation into Tyger and would not be taking any action against Tyger.

45.     Knowing that UT would take no action in response to the Title IX reports that Tyger had sexually harassed her, Wamer had an increasingly difficult time concentrating on her studies and feared visiting campus and attending in-person courses.

46.     Due to UT's refusal to address Tyger's misconduct toward her, Wamer changed her major, avoided coming to campus, and began enrolling in online classes to ensure that she would not come into contact with Tyger.

**D.      When the Title IX office received a *third* report of Tyger's misconduct in November 2018, UT finally responded by disciplining and terminating Tyger.**

47.     O'Korn was also dismayed that UT had done nothing about his and Ms. Wamer's Title IX reports, and thus arranged a meeting between Ms. Wamer and a more senior UT faculty member, Deloris Drummond, to discuss the issue. This meeting took place on October 26, 2018.

48.     On October 29, 2018, Drummond emailed Kamm and David Tucker, who was then chair of UT's Communications Department, to report the information she had discussed during her face-to-face meeting with Wamer. Drummond also submitted a report to the Title IX office concerning Tyger's sexual harassment of Wamer.

49.     On November 7, 2018, Wamer received a letter from Kamm confirming that UT's Title IX Office had received an incident report naming Wamer as a victim of sexual misconduct.

50.     On November 27, 2018, UT placed Tyger on paid administrative leave and prohibited him from coming to campus, based on allegations that he had "engaged in inappropriate conduct of a sexual nature toward a student, in violation of Title IX, and the University Policies related to Title IX." *See* **Exhibit 3**, administrative leave letter.

51.     Tyger subsequently began attempting to smear Wamer to the UT community by outing her as the one who reported him, publicizing the grades he had given her, and accusing her of lying.

52.     On January 8, 2019, UT's Title IX investigators Stacy Latta and Ardy Gonyer interviewed O'Korn, who confirmed that Wamer would have been "more comfortable" talking to someone

other than an investigator "about the situation." **Ex. 1,** at 45–46.

53. During his interview with Latta and Gonyer, O'Korn also confirmed that Wamer "ha[d] not been in Rocket Hall since May, and that [she] even went to the point of scheduling mostly online classes so as to not have to be in the building due to [Tyger]'s presence." *See* **Ex. 1**, at 46.

54. By letter dated April 3, 2019, UT informed Tyger that it was terminating him, effective May 6, 2019, based on "issues with [his] performance." *See* **Exhibit 4,** termination letter.

55. On May 10, 2019, a year after O'Korn and Wamer had reported Tyger for sexually harassing Wamer, UT held a pre-disciplinary hearing.

56. In light of the hearing, UT found that Tyger "used his position of power and authority to initiate unwelcome physical contact, behaved in a sexual manner towards a student enrolled in his class and he behaved unprofessionally." *See* **Exhibit 5,** pre-disciplinary letter, at 6.

## V. Cause of Action

### Count One: Violation of Title IX

57. Wamer incorporates the foregoing paragraphs as if fully rewritten here.

58. As of May 4, 2018, UT had actual knowledge of detailed, specific, and credible allegations that Tyger, one of UT's professors, was sexually harassing Wamer, a student.

59. Despite having such actual knowledge, UT not only failed to respond with adequate investigation, disciplinary action, or remediation efforts, but essentially ignored two reports that Tyger, a faculty member, was sexually harassing Wamer, a student.

60. UT's lack of response to the reports of sexual harassment described herein was clearly unreasonable in light of the known circumstances and amounts to deliberate indifference in violation of Title IX.

61. UT's deliberate indifference of the multiple reports that Tyger had sexually harassed Wamer caused Wamer to suffer and made her vulnerable to additional unwelcome sexual harassment until

May 2019, when UT finally investigated and proceeded to terminate Tyger on the basis of the very same allegations of which UT was aware in May of 2018.

62. UT's conduct, as described herein, unreasonably interfered with Wamer's participation in and enjoyment of the benefits of UT's educational programs and activities.

63. As a proximate result of UT's deliberate indifference toward Wamer's reports that Tyger was sexually harassing her, Wamer has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

## VI. Prayer for Relief

Wherefore, Plaintiff respectfully requests that this Court award damages against the Defendant in an amount in excess of $75,000, together with punitive and exemplary damages, attorneys' fees, costs, expenses, and any other relief to which the Plaintiff may be entitled or that the Court finds is appropriate and equitable.

## VII. Jury Demand

Plaintiff Jaycee Wamer demands a trial by jury on all issues within the Complaint.

Respectfully Submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
Rachel Hazelet (0097855)
THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn, Ohio 44333
Phone: 330.836.8533
Fax: 330.836.8536
peter@pattakoslaw.com
rhazelet@pattakoslaw.com

*Attorneys for Plaintiff Jaycee Wamer*